328 So.2d 830 (1976)
Helen Ruth HUGHES, Petitioner,
v.
DENNY'S RESTAURANT et al., Respondents.
No. 46638.
Supreme Court of Florida.
January 21, 1976.
Rehearing Denied April 13, 1976.
*832 Paul R. Stern of Stern & Bernardini, Daytona Beach, for petitioner.
E.J. Gierach of Gierach & Ewald, Orlando, for respondents.
BOYD, Justice.
This cause is before us on petition for writ of certiorari to the Florida Industrial Relations Commission. We have jurisdiction pursuant to Article V, Section 3(b)(3), Florida Constitution.
The claimant, petitioner herein, seeks review of an Order of the Industrial Relations Commission dated December 10, 1974, which reversed an earlier Order of the Judge of Industrial Claims holding that petitioner had a 75% permanent partial disability. The facts of the case are as follows.
Petitioner originally sustained an industrial slip-and-fall accident on May 30, 1970; subsequently, an injury was discovered with damage between the C-5 and C-6 interspaces of the spine, as well as some problems in the low back area which do not concern us sub judice. The case was pending before the original Judge of Industrial Claims for a lengthy period of time, during which the principal treating physician, through new diagnostic techniques, identified a condition located at C-4 and C-5 of which he had not been previously aware. This is an entirely different condition from the condition at C-5 and C-6 which had been identified and treated previously. The doctor retracted his former opinions as to cause and origin, as well as his former opinions as to the believability of the patient. That original Judge of Industrial Claims then ruled the claim to be compensable, a ruling reversed by the Industrial Relations Commission on the ground that Rule 3 (presently Rule 8) had been violated in that testimony had been taken more than 90 days after the first hearing. The Respondent-Commission directed a new Judge of Industrial Claims to enter an order based solely upon testimony taken in the first 90 days. The new Judge complied in what is referred to by the Respondent-Commission as "the first order," wherein petitioner's claim was dismissed because the claimant's cervical pathology at C-5-6 could not be causally related to the industrial accident. Thereafter, the claimant filed her petition to modify in accordance with the principles outlined in Sauder v. Coast Cities Coaches, Inc.[1] Once again the principal treating physician appeared and testified (1) that there are two different problems in the cervical area of petitioner's spine, one of which he had previously identified at C-5 and C-6; (2) that on the basis of a newly discovered diagnostic technique he was able to identify a problem at C-4 and C-5 which he did not originally believe existed; and (3) that, now, he could establish a causal relationship with the condition at C-4 and C-5 and the industrial accident on the basis of the history related by claimant, which history at that point became logical in light of the newly discovered diagnostic technique. The new Judge of Industrial Claims then entered what the Respondent-Commission refers to as "the second order," which was an order on a petition to modify and which held the claim to be compensable. In this "second order" the Judge of Industrial Claims specifically found as follows:
"1. The mandate of the Industrial Relations Commission required that the *833 only evidence to be considered at the time of entry of the order of January 30, 1974, was the evidence received at the hearing of September 17, 1971, or within a ninety (90) day period thereafter. No consideration whatsoever was given to any evidence received or heard and appearing in the record subsequent to the ninety (90) day period commencing September 17, 1971.
"2. In his deposition of September 7, 1971, Dr. Jules S. Neviaser testified that he noted degenerative changes with auto-fusion or sound change of fusion between the intervertebral bodies of C-5 and C-6. He repeated several times that he was concerned about degenerative disease at the level of C-5 and C-6, that is the disc space between those two levels. He also indicated treatment for her for the low back including major surgery. He thought the patient needed the care of a psychiatrist and referred her to one. He stated there was no way he could relate the injuries he found, that is the injuries between C-5 and C-6 and the injuries of the low back to the industrial injury. It was on this basis that the order herein sought to be modified was entered. The doctor never mentioned any injury to the disc space between C-4 and C-5.

"3. In the testimony before the undersigned Judge on Friday, May 17, 1974, with a cine-radiograph introduced into evidence, it appeared that a new evidentiary factor was first discovered in January, 1972. That this evidentiary factor showed a serious injury requiring surgery at the level of C-4  C-5, one level above the level for which the doctor thought he was treating the patient. That with all diligence and with the extent of medical knowledge available in the community and the extent of medical facilities available to this doctor in the community at that time Dr. Neviaser testified that he could not have determined or discovered the injury at C-4  C-5 earlier than January, 1972. ...
"4. The undersigned finds that the claimant has been temporarily and totally disabled from the date of the accident, May 30, 1970 to the last time she was examined by Dr. Neviaser on April 17, 1974 as a result of the neck injury to C-4  C-5 interspace.
"5. I further find that the injury to claimant's back is a totally unrelated condition to that of the injury to the claimant's neck which was sustained in this industrial accident and is not compensable. The physician is directed to refile his medical statements eliminating any treatment which was for the back.
"6. I accept as true the professional opinion of Dr. J.S. Neviaser as per his testimony before me on May 17, 1974, that the condition for which he treated this patient was an instability of the cervical spine at the level of C-4  C-5 requiring surgery and that the injury was within reasonable medical probability caused by the claimant's industrial accident." (E.S.)
Based on these findings the Judge of Industrial Claims granted petitioner's requested modification with certain exclusions.
The Respondent-Commission reversed the "second order," holding that the "first order," which held that there was no causal relationship between these injuries and the industrial accident, established the law of the case and that, therefore, it was unnecessary to consider the merits of the claim. It is from this order of reversal that this petition for certiorari is brought.
Section 440.28, Florida Statutes, reads in pertinent part as follows:
"... upon the application of any party in interest, on the ground of a change in condition or because of a mistake in a determination of fact the division may... at any time prior to two years after ... an order rejecting a claim ..., review a *834 compensation case ... and ... issue a new compensation order ..."
We recognize that it has been held that the "mistake of fact" contemplated by this section is one made by either the deputy commissioner or by the Respondent-Commission.[2] Nevertheless, it is our view that, where the state of the medical art advances to the point that new evidence becomes available which was not and could not have been previously known, then, in that limited situation, the Judge of Industrial Claims is justified in concluding that she had made a mistake of fact and in granting a modification where such is supported by the evidence. An analogous situation to the instant one was present in Orme v. M.R. Harrison Construction Co.[3] In that case a claimant fell in 1956 and sustained an injury to his right knee; within a relatively short period of time he had incurred two other accidents affecting his legs and/or knees. In the original 1957 hearing the deputy commissioner found both the first and second industrial employers liable to furnish remedial surgery and hospital care as required to alleviate the disability to claimant's right knee. Thereafter, in 1959 claimant applied for modification of the compensation order under Section 440.28, Florida Statutes, supra, the basis being a mistake in determination of fact in that claimant's left knee was in need of surgery. The deputy modified his earlier order and held the original employer solely liable to claimant for the injury to his left knee, which injury occurred as a result of the original industrial accident. On appeal, the full commission reversed the deputy's order, holding that there was no competent and substantial evidence to support it. This Court reversed the commission's order and reinstated and affirmed the holding of the deputy, stating that there was ample evidence to support the deputy's finding as to his mistake of fact (in that he was ignorant of any injury to the left knee at the initial hearing). In the instant case, the record clearly shows that, because of new medical diagnostic techniques, the injury caused by the petitioner's industrial accident was eventually identified and treated. The testimony to this effect is as follows.
On direct examination the following was elicited:
"Q. [by Mr. Stern]: ... Did you discover anything subsequent 
"A. [by Dr. Neviaser]: To my testimony?
"Q.  to your deposition of 1971?
"A. Yes.
"Q... . What did you discover subsequent to that, and how was that discovery made?
"A... . The patient continued with symptoms ... and, finally, the study became available to us called a cine radiograph.
"Q. Is this something relatively new, Doctor?
"A. Yes.
"Q. Can you tell us what a cine radiograph is?
"A. A cine radiograph is a motion picture of the throat and the spine.
"Q. An X-ray on motion pictures?
"A. Yes.
* * * * * *
It can show instability present that would not be present on conventional, ordinary means.
And a patient would have normal-appearing X-rays. She would have normal-appearing myelograms.

*835 And they can actually have normal EMG's.
All those can be normal, yet they can have cervical instability present.
This was demonstrated on cine radiographs in 1972 on Mrs. Hughes.
* * * * * *
"Q... . These cine radiographs showed a particular radiograph, did they not?
"A. Yes. They showed an abnormality ... between C-4 and 5... .
"Q... . Do they also show another problem that you had previously been familiar with?
"A. Yes.
They showed some narrowing and spurring at C-5, 6.
* * * * * *
"A. We're looking  having the advantage now of looking back through the so-called retrospective scope.
* * * * * *
"Q. With 100 percent hindsight, what is the diagnosis of this lady?
"A. She has cervical instability at the C-4, 5 level.
"Q. Had you any knowledge of this when you gave your deposition in September of '71?
"A. No, sir.
"Q. Do you have a professional opinion within reasonable medical probability as to whether the cervical instability which you found at C-4, 5 was causally related to the industrial accident of May 30th, 1970, which you described in the deposition that you gave in September of '71?
"A... . I would say yes. There is no  there's just no doubt in my mind.
"Q. No doubt in your mind about what?
"A. That causal relationship.
"Q. You are saying that there was a causal relationship?
"A. Yes, sir.
* * * * * *
"Q... . Doctor, in your opinion, was the operation that you performed reasonably necessary 
"A. Oh, absolutely.
"Q.  as a result of the industrial accident of May, 1970?
"A. Yes, sir.
"Q. Doctor, could you have known about the necessity of this industrial accident prior to the cine radiograph studies that were done in January following your original testimony?
"A. No, sir. No way.
This is the only method I know of to produce this study... .
"Q. What did you think you were treating in the neck prior to the cine radiograph?
"A. Degenerative disease at C-5, 6, and the lower level.
"Q. You weren't even aware of the condition 
"A. No.
"Q.  at C-4, 5?
"A. I was not.
"Q. Is that the basis on which you gave your testimony on deposition on September 17th?
"A. Yes, sir."
*836 On cross-examination the following testimony developed:
"Q. [By Mr. Gierach]: Doctor, the method you used to discover the condition of C-4, 5 in Mrs. Hughes was available here in the United States, was it not, earlier?
"A. Yes. In Chicago.
"Q. Was it available in Florida?
"A. No, sir.
* * * * * *
"Q. [By the Judge]: When was this equipment obtained in the Daytona Beach area?
"A. It's only at Ormond Memorial Hospital, and, to my knowledge, I became aware of the existence of this procedure  I think it was after the deposition.
* * * * * *
"Q. [By the Judge]: But at least it was in your knowledge after the time of this deposition?
* * * * * *
"A. Yes, ma'am.
And I  in fact, to my knowledge, this is one of the first ones that was done in the City of Daytona Beach.
* * * * * *
"Q. [By Mr. Gierach]: I would like to have this question answered, whether or not this equipment was available in the United States prior to the time we took your deposition?
"A. Yes. It was available in the United States."
On redirect examination the following was disclosed:
"Q. [By Mr. Stern]: ... With one hundred percent hindsight, we now know that there are two different problems in the cervical spine; is that correct?
"A. That is correct, sir.
"Q. There's a condition at 5, 6, which you described... as spurring.
"A. Yes, sir.
"Q. And that you knew about from the first time you saw the patient.
"A. That's correct.
"Q. [By the Judge] Oh, and this is the congenital anomaly?
"A. No. It's not. No.
... This is an unrelated finding
* * * * * *
[which] I initially thought it was symptomatic].
"Q. [By the Judge] But, then, what actually was contributing to the symptoms was the undiscovered condition immediately above this condition, which was observed on still X-ray, and the condition above was eventually observed on motion X-ray?
"A. Yes, ma'am.
"Q. [By the Judge] And this was, in your opinion, caused by the industrial accident?
"A. The one above it [C-4, C-5].
"Q. [By the Judge] The one above [C-4, C-5]?
"A. Yes.
"Q. [By the Judge] And this is the condition for which you performed the operation?
"A. That is correct.
* * * * * *
"Q. Your opinion that the condition you saw at surgery 
"A. Yes. Okay.

*837 "Q.  was related to the industrial accident of May 30th, 1970  did you express that opinion within reasonable medical probability?
"A. Yes.
"Q. Doctor, would you have found this condition but for the cine radiograph?
"A. Not I. No.
* * * * * *
"Q. Doctor, can you give us the date of the cine radiograph again?
"A. January 4, '72."
On recross examination the following colloquy occurred:
"Q. [By Mr. Gierach]: Doctor, since September 7th, 1971, when we took your deposition, the testimony that was previously given at a hearing before Judge Ottinger represents ... a mistake on your part... .
"A. No ... it's not a mistake.
"Q. Did you change your mind, or just a change 
"A. No
"Q.  in the diagnosis?
"[By the Judge]: I would call it an amplification of knowledge.
* * * * * *
"A. I like that expression.
"Q. An amplification of knowledge?
"A. There was no mistake made... .
* * * * * *
"Q. The condition that you found on cine radiograph was there at the time that your deposition was taken on September 7th, 1971?
"A. Yes. (inaudible)  know about the ways to show it.
* * * * * *
"Q. [By the Judge]: In effect, this is additional facts coming to the knowledge of the medical examiner?
"A. Yes... ."
On redirect examination the following was brought out:
"Q. Doctor, do you know of your own knowledge if this was the first cervical study done with that machine in Volusia County?
"A. Yes. To my knowledge, it is the first one."
* * * * * *
Clearly, the evidence adduced at the modification hearing was not merely cumulative nor did it simply controvert evidence taken at the original hearing, which would be contrary to the principles enunciated in Beaty v. M & S Maintenance Co.,[4]Hall v. Seaborad Maritime Corp.,[5] and Power v. Joseph G. Moretti, Inc.[6] To the contrary, the doctor's original testimony related to the injury found at C-5 and C-6, while his later testimony on petition for modification pertained to the injury found at C-4 and C-5, a completely different area of injury. Furthermore, the doctor makes clear in his testimony that his original diagnosis was not mistaken but that he now had new information about a different injury, thereby distinguishing this case from Power, supra. Obviously, there is presently evidence of an injury which was lacking before and which the Commission did not examine before because it was not then known.[7] In our view, the petitioner seeking *838 modification on ground of mistake of fact carried her burden of proof.[8]
Contrary to Respondent's position, this is not a relitigation of identical issues, nor is it merely "cumulative evidence" seeking to abrogate the previous final finding. The order of January 31, 1974, determined that there was no causal relationship between the industrial accident and the cervical condition then known of at C-5 and C-6. Can that ruling be held to be the "law of the case," "res judicata" and "estoppel by judgment" in regard to the issue of whether there exists a causal relationship between the industrial accident sustained by petitioner and the injury she suffers at C-4 and C-5? We think not. Furthermore, it is our view that the concept of modification is so inherently a part of workmen's compensation law, unlike tort litigation, that under the circumstances sub judice we do not find the doctrines of "res judicata," "law of the case" or "estoppel by judgment" to be applicable here.
It is well argued that the views expressed herein could result in an interminable series of litigation if taken to its ultimate extreme. Therefore, to prevent such interpretation, we expressly limit this holding to include only those injuries which may be discovered within the immediate time frame after the original testimony, which injuries could not have been discovered by use of medical technology available to the treating physician at the time of the original examination. In no event should this time period exceed the two-year limitation imposed by Section 440.28, Florida Statutes; we feel this conforms to the legislative intent.
Accordingly, the petition for writ of certiorari is granted, the order of the Industrial Relations Commission is quashed, and the cause remanded with directions to reinstate the May 24, 1974, order of the Judge of the Industrial Claims awarding petitioner-claimant temporary total disability and medical expenses.
It is so ordered.
ADKINS, C.J., and ROBERTS, OVERTON and HATCHETT, JJ., concur.
ENGLAND and SUNDBERG, JJ., dissent.
NOTES
[1] 156 So.2d 162 (Fla. 1963).
[2] Steele v. A.D.H. Bldg. Contractors, Inc., 174 So.2d 16 (Fla. 1965); Hall v. Seaboard Maritime Corp., 104 So.2d 384 (Fla.App. 1958).
[3] 127 So.2d 104 (Fla. 1961).
[4] 124 So.2d 868 (Fla. 1960).
[5] Supra, Note 2.
[6] 120 So.2d 443 (Fla. 1960).
[7] Hall, supra, Note 2.
[8] Sauder, supra, Note 1.